**\*\*\* FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-13-0001285
15-JUN-2020
09:41 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

_____

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee,

vs.

JOSHUA R.D. WILLIAMS,
Petitioner/Defendant-Appellant.

_____

SCWC-13-0001285

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0001285; CR. NO. 12-1-0425)

June 15, 2020

McKENNA, POLLACK, AND WILSON, JJ.,
WITH NAKAYAMA, J., DISSENTING, IN WHICH RECKTENWALD, C.J. JOINS

OPINION OF THE COURT BY WILSON, J.

## I.    INTRODUCTION

Petitioner/Defendant-Appellant Joshua R.D. Williams ("Williams") was charged with the attempted murder in the second degree of David Quindt, Jr. ("Quindt").

On certiorari, we conclude the Circuit Court of the First Circuit ("circuit court") erred by precluding Williams

from testifying to the jury about what he believed Quindt said to him that caused him to act in self-defense. By so doing, the circuit court prohibited Williams from presenting state of mind evidence relevant to his self-defense claim, thus violating his due process right to be accorded a meaningful opportunity to present a complete defense.[1]

## II.  BACKGROUND

The attempted murder charge arose from an altercation between Williams and Quindt on the night of March 12, 2012. The primary disputed issue at trial was whether Williams acted in self-defense.

### A.  Pre-Trial:  Hawai‘i Rules of Evidence 404(b) Notice of Prior Bad Acts

Prior to trial, Williams filed a Hawai‘i Rules of Evidence ("HRE") Rule 404(b)[2] notice of prior bad acts

---

[1]  Our holding makes unnecessary consideration of Williams' second issue, concerning whether Williams waived his initial aggressor claim.

[2]  HRE Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible where such evidence is probative of any other fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

("notice"). Williams sought to present to the jury Quindt's statements to him, in which Quindt told Williams about Quindt's violent past. Williams proffered the statements as relevant to his claim that he feared for his life during the altercation. The notice stated that "[d]uring the 2-3 week time period prior to the date of the incident" Quindt would "boast and brag" about the following seven acts:

a. Doing time for the crime of murder in California[;]

b. That he did hard time in California;

c. That he knows how to fight because of the time he spent in jail and that he had to learn to fight to survive;

d. That he knows about gang-bangers and gang-members;

e. That he has experience with violence from spending time in jail;

f. That he "got away" with murder by beating the charge – because someone else took credit for it;

g. That he did the crime but got off on a technicality.

Respondent/Plaintiff-Appellee State of Hawai'i ("State") then filed a motion in limine, opposing admission of the evidence. In its motion, the State sought to preclude "an allegation that [Quindt] has been arrested for murder and was incarcerated on murder charges" and "[a]ny and all references to David Quindt as being [a] '[h]ard criminal', 'gang banger', or any other similar references." The State contended that "[s]uch evidence is . . . irrelevant because it does not go to David Quindt's credibility as to the instant offense that Defendant is charged with."

3

At the hearing on Williams' notice and the State's motion, defense counsel explained that the statements included in the notice "have to do with my client's state of mind and the things that were in his head as a result of statements made by Mr. Quindt that caused him to then be concerned for his personal safety.  So they go directly to his state of mind."[3]

The State objected to Williams testifying that Quindt told him Quindt was convicted of murder.  The State further objected to Williams revealing to the jury that Quindt claimed he was subsequently exonerated of murder; according to the State such evidence would "create a lot of confusion for the jury[.]"  The State argued that it would be too prejudicial and too confusing to the jury for Williams to present the proffered statements.

The circuit court granted the government's request and thus prevented Williams from offering his chosen testimony to the jury.  The circuit court ordered Williams not to testify to the jury that Quindt would boast and brag about having done time for the crime of murder in California; nor could he testify that Quindt would boast and brag about having done hard time in California; and Williams was precluded from offering in his defense his eyewitness testimony that Quindt told him "he knows

---

[3]     The Honorable Karen S.S. Ahn presided.

how to fight because of the time he spent in jail and that he had to learn to fight to survive[.]"

Instead, the circuit court curtailed the testimony the defendant could offer in his own defense. As to statement (a), that Quindt would boast and brag about having done time for the crime of murder in California, and statement (b), that Quindt would boast and brag about having done hard time in California, the circuit court concluded that the statements were "one and the same." Thus, the circuit court prohibited Williams from telling the jury that Quindt would boast and brag about having done time for the crime of murder, and Williams was not permitted to explain to the jury that Quindt told him he did hard time in California.

In reference to statement (c), that Quindt "knows how to fight because of the time he spent in jail and that he had to learn to fight to survive," the circuit court did not explain why it prohibited Williams from informing the jury that Quindt learned to fight "to survive."

As to statement (d), the circuit court ruled that the defense could not reference Quindt's familiarity with "gang-bangers and gang-members" because the statement was "too general." The circuit court rejected defense counsel's position that Williams interpreted the term "gangbanger" as "something

5

beyond just . . . minor gang activity" but rather as "something a little bit more serious and involv[ing] more violence."

The circuit court also prevented Williams from offering statement (e), that Quindt "has experience with violence from spending time in jail." The circuit court concluded without explanation that the statement was "too general." The circuit court did not elaborate as to why statement (e) was too general.

The circuit court also excluded as irrelevant statement (f), that Quindt would boast and brag about getting away with murder, and statement (g), that Quindt would boast and brag that he "got off on a technicality[.]" According to the circuit court, exoneration "is irrelevant to violent conduct" because the "question is what [Williams] believed this man could do."

In sum, the circuit court would not permit Williams to testify fully about what Quindt told him, which Williams contended caused him to fear Quindt and to use violence to protect himself. In place of his proffered testimony about Quindt's statements to him, the circuit court ordered Williams to testify only that Quindt said he was convicted of murder and that "[Quindt] knows how to fight. He learned how to fight in jail."

B.    Circuit Court Proceedings

A three-day jury trial commenced on January 17, 2013.

1.    The State's Case in Chief

Quindt testified as follows:

On March 10, 2012, Williams was renting a room from Quindt.  Williams and his son moved in with Quindt approximately three weeks prior to the altercation.

Before the altercation, Quindt felt "tired," "exhausted," and "frustrated."  His planned tasks for the day were taking up more time than he anticipated.  Quindt had been working on a tattoo for Williams that took longer than expected.  Quindt was also scheduled to perform a piercing for a friend of Williams following the tattoo appointment.  Quindt and Williams went to Williams' friend's house to do the piercing.  On the way to Williams' friend's house, Quindt picked up Williams' son and dropped him off at Quindt's home.

When they arrived at Quindt's home, Quindt's frustration grew.  Quindt waited in the car for two to three minutes while Williams took his son into the home.  Quindt felt frustrated because he was doing a favor for Williams by doing a piercing for his friend, and he asked Williams to hurry because he wanted to "get home and rest and work on some drawings [for tattoos]."  Quindt also had previously had back surgery and "long, strenuous sitting" hurt his back.

7

When Williams returned to the car, Quindt and Williams began arguing about the wait. Williams "got irritated, started kind of yelling at [him]." Quindt told Williams, "please don't disrespect me." As Quindt drove down the street, Williams jumped out of the vehicle. Quindt then stopped the vehicle and told Williams to get back in the car. Quindt did not push Williams to the ground while trying to get him back into the car and did not throw him into the car. Williams reentered the vehicle to sit in the right passenger backseat, which Quindt thought "was a little weird."

Once Williams returned to the backseat of the car, Quindt became more upset on the drive because Williams began talking on his phone to his ex-girlfriend.[4] Quindt told Williams that he should not be speaking with his ex-girlfriend because Williams had a restraining order against her. Quindt had been helping Williams with his custody case, and he told Williams, "You're going to mess your case up of getting custody for [your son.]"

Quindt and Williams were yelling and swearing at each other. Quindt told Williams to "get the fuck out of my house."

---

[4] Quindt testified on cross-examination that he was not sure if Williams spoke with his girlfriend or merely told Quindt that he was trying to talk to her.

Williams said "I'll get out.  You can keep everything that's there, the food, all the stuff, clothes."

While driving, Quindt felt Williams hit him on the side of his face.  At first, Quindt thought he had been punched, but then he felt blood running down his neck.[5]  Williams had struck Quindt with a knife.  Quindt then "started fighting, gassing the car, hitting the brake, gassing the car, trying to throw [Williams] off balance."

Quindt continued to drive the car until he reached the Waianae Mall parking lot.  Quindt then put the vehicle in park, jumped out, and ran in front of it into the headlights.  Williams was on his phone, and Quindt overheard Williams calling his mother.

Quindt then attempted to call 911 to get help to take him to the hospital, but when he tried to dial 911, the blood on the telephone's screen prevented him from doing so.  Quindt went to the car and told Williams, "[I]f I die, you're going to get in more trouble.  I need you to take me to the hospital."  Williams then drove Quindt to Waianae Coast Comprehensive Health Center.

_____

[5]     Quindt testified that his injuries were: a stab wound through his nose and out through his top lip, a 3-4 inch laceration on his left arm, a laceration extending from the right side of his face down to his Adam's apple, and cuts on his fingers and on his chest from fighting with Williams.

Quindt told Williams "don't worry, I won't get you into trouble" because he was "afraid for [his] life." Quindt never told Williams to get rid of the knife or to make up a story of being attacked. After arriving at the health center, Williams said he was going to get rid of the knife and ran toward the ocean.

Before Williams struck him, Quindt did not threaten to kill or hurt Williams. On the day of the incident, Quindt was carrying a folded knife in his back pants pocket. Quindt did not take out his knife or threaten Williams with it.

Quindt never directly mentioned to Williams that Quindt had been convicted of a murder. According to Quindt, Williams may have overheard him discussing the conviction with a member of the Hawai'i Innocence Project. Quindt explained that, although he had been convicted of murder, he was later exonerated.

During cross-examination, the circuit court gave a limiting instruction to the jury concerning the statements the court admitted from Williams' notice of prior bad acts. The circuit court explained to the jury that it could only use evidence concerning Quindt's murder conviction and his learning how to fight in jail to evaluate Williams' state of mind. On cross-examination, Quindt denied that he spoke to Williams about the murder conviction. But, after his memory was refreshed by a

transcript of what he previously told a detective, Quindt agreed that he was "up front" with Williams about his criminal history.

After Quindt's testimony, the State also introduced testimony by Ernest Robello, a detective with the Honolulu Police Department.  Detective Robello testified that Williams initially told him that he and Quindt went to a beach park and had a confrontation with three unknown men, one of whom stabbed Quindt.  After Detective Robello confronted Williams about discrepancies in his statement, Williams explained that Quindt suggested that they come up with a story and admitted to striking Quindt.  Initially, Williams claimed he threw the knife in the ocean and it was not recoverable, but later stated that he hid the knife near Waianae Coast Comprehensive Health Center.

Detective Robello testified that Williams stated he struck Quindt "in self-defense."  Williams told Detective Robello that "he thought that Mr. Quindt was reaching for his back pocket," and that he knew Quindt "normally carries a knife in that pocket."  Detective Robello explained that he asked Williams whether striking Quindt was "kind of a preemptive strike" and whether Williams "stabbed [Quindt] with the intent to kill him before he could kill you."  Williams answered "yes" to both questions.

Detective Robello also testified that Williams shared with him some of Quindt's criminal history.  According to

Detective Robello, Williams stated that "the night before the stabbing, during an argument between the two of them, he said that Mr. Quindt had said that he had been incarcerated. He had killed somebody in the past and gotten away with it."

### 2. The Defense's Case

Williams testified in his own defense at trial in compliance with the restrictions placed upon his testimony by the trial judge. He explained that his relationship with Quindt was adversarial, with Quindt being the "[a]lpha male." Williams said that he did not spend much time with Quindt but when he did, they "would kind of butt heads." Williams elaborated that Quindt "would tell me things to do, and if I did them a different way, he would, I guess, bash me down on it." Williams testified that when Quindt and he got into a "few arguments", he would "scare" Williams because Quindt was "really jumpy." According to Williams, Quindt "lost his temper very easily" and "[w]hen he'd lose his temper, he would want to fight." Williams stated, "I don't really like confrontation that much myself, and I'm usually the type to just walk away from things." Quindt, however, was "more the type to instigate a fight and push for a fight." Williams said that a few times "it came very close to an actual altercation" but "[t]here was never actually physical blows thrown." By the 17th or 18th day of living with Quindt, he was getting "second thoughts" and was "getting scared."

12

Williams testified that he also feared Quindt because, in the past, Quindt on several occasions had "nonchalantly . . . bragg[ed] about an alleged attempted murder that he committed." According to Williams, Quindt "directly [spoke to Williams] about the murder charge. He bragged about it multiple times. . . . In my eyes, I just -- I was frightened by it really in the long run." Williams testified that this knowledge affected his state of mind: "Anytime an altercation would happen, anytime that he would lose his temper, it was the first thing in my mind, was that that had happened and that he bragged about it. So it was, I guess, a touchy subject or it -- it alarmed me."

Williams testified that, on the date of the incident, he attempted to avoid a confrontation with Quindt when they began arguing in the car. Williams explained that when he returned to Quindt's car after settling his son in for the night, he noticed that Quindt was "really upset." Williams stated that Quindt "started yelling at [him] asking what took [him] so fucking long" and Quindt exclaimed that Williams "was disrespectful for never appreciating his suggestions and just cursing at [him] and yelling at [him]." Williams explained that he does not like confrontation, and that when he is being yelled at or called names, his coping mechanism is to pull "[himself] from that situation, turn [his] back, walk away, whatever, just to get away from the situation. Some people count to 10. [He]

walk[s] away."  In an effort to avoid the confrontation with Quindt, Williams jumped out of the car as Quindt slowed to a stop sign.

After jumping out of Quindt's car, Williams claimed "next thing I know, I'm on the ground, and [Quindt] had came [sic] up from behind me and pushed me about shoulder length with both hands onto the pavement."  Williams said that Quindt was yelling at him again, "fuck this shit, let's do it, you know, it's time to fight.  Do you think I'm afraid of you?"  Williams said that Quindt also yelled, "you think I'm afraid of you?  I learned how to fight in jail I'm not afraid of you.  Let's do this, let's throw."  According to Williams, Quindt was "getting in a fight stance."  Williams told Quindt he did not want to fight, turned his back to Quindt, and started to walk away.  Quindt came up behind Williams and said "if you don't get in the truck, I'll make you get in the fucking truck," then pushed Williams toward the car.  Quindt pushed Williams into the backseat of the car.  After Williams was in the car, Williams stated that Quindt drove "erratically."  During this time, Quindt told him "I've done nothing but try to help you out, why have you been so disrespectful?"  Williams described Quindt as "screaming at me, flustered face, really expressive, and just kind of overall scary."  Williams said that his voice may have risen but that he was trying to "calm the situation down."

Williams testified that he attempted to jump out of the car again, but the child safety locks were engaged and he could not open the doors or the windows. Williams stated that "[a]s I'm doing this, I look up and [Quindt is] looking at me in the rear-view mirror, and he kind of smiles at me. The only way I can explain it would be like a sardonic smile, like ha-ha, I got you, you know, you're not getting anywhere." Williams explained at this point he was thinking "holy shit, I'm trapped, I'm stuck in this guy's truck. He's murdered before. He's yelling at me, screaming at me. What am I going to do?" Williams testified that at one point during the drive, Quindt looked at Williams and said, "when I stop this truck, I'm going to fucking kill you." Williams explained that after Quindt made this statement, he was afraid based on his knowledge that Quindt had murdered before:

> The main thing that kept going through my mind was that [Quindt] brags about killing people, and I didn't know if he was for real about it. I didn't know if he was joking about it. I didn't know if he would actually kill me. I didn't know anything at that point. I was scared. I was petrified. In my mind, I really thought I was going to die.

Williams testified that, after Quindt made the threatening statement, Quindt turned down a dark road and "he says I'm going to kill you, and he goes like this, like he nods, like he was assuring himself or something."

15

Fearing that his life was in danger, Williams testified that he then decided to strike Quindt: "I was scared, and I stabbed him. I -- I took the knife out of my pocket, and I stabbed him. I didn't aim. I didn't try to hit a certain area. I just went around the seat of the truck, and I stabbed." Williams explained that when he decided to use the knife to strike Quindt, he was "petrified" because he thought Quindt would kill him:

> I was petrified. I had never been so scared. I -- there wasn't really much time from when he threatened me to we're in a dark street now and he's -- he's going to kill me. There was -- besides terror, I don't think I was thinking anything besides I can't let him stop this truck. It's my only possibility -- he said when he stops this truck, he's going to fucking kill me, and I can't let him stop the truck.

After the altercation, Williams panicked because he had just struck his friend, and he feared for his life as well as Quindt's. Quindt pulled into the Waianae Mall parking lot and both men left the car. Williams got out of the car by pressing the button by the driver's seat that rolled down the back passenger window, then opened the door from the outside. Williams testified that he put the truck between him and Quindt as a "barrier," then threw up. Williams described his feelings as "distraught" and that he had "just stabbed my friend. I was very scared for his life, for mine." He then called his mother, and he told her that Quindt was hurt, that Quindt and Williams

were going to the hospital, and he asked her to come to the hospital.[6]

Despite his panic, Williams sought to aid Quindt. Williams saw that Quindt was "bleeding really badly from his neck" and testified that he took off his shirt and "wrapped it around [Quindt's] neck and told him to put pressure on it." According to Williams, he told Quindt that he needed to go to the hospital. Williams testified that he then drove Quindt to the Waianae Coast Comprehensive Health Center while "crying hysterically."

Williams explained he initially lied to police because Quindt had told him to do so. Williams stated that, on the way to the health center, Quindt told him "don't tell the police what happened, don't worry, dude, don't worry, nothing's going to happen, don't tell the police." According to Williams, after arriving at the health center, Quindt told him "get the knife and go get rid of it and come back up here and get cleaned up . . . and get ready for the police. Don't tell them what happened[.]" Williams hid the knife and returned to the health center where he met with police officers.

---

[6] Williams' mother testified that, when she picked up the call from Williams, "he just kept saying mom and -- and I -- I'm -- I'm scared, I'm scared. He was very hysterical. I had a very hard time understanding what he was saying."

On cross examination, the State asked Williams about his intent when he struck Quindt. Williams agreed that he told Detective Robello that he had "stabbed [Quindt] with the intent to kill him before [Quindt] could kill [Williams]." Williams explained that he felt that way "[a]t the time that I gave that statement." He also testified that he had seen a weapon on Quindt earlier in the evening.

On redirect, Williams described in more detail his state of mind at the time of the altercation. Williams explained that he thought that he needed to attack Quindt because he thought Quindt would kill him:

> I was thinking I need to do something to prevent him from killing me, like he threatened to do to me. He said he was going to kill me. I didn't think of killing him. I thought of maiming him. I thought of just incapacitating him so he couldn't try to kill me. I was locked in the back of his truck. I didn't want to give him the opportunity to open my door and have an advantage over me. I -- I didn't want to kill him. I don't know why I said that, but I didn't want to kill him.
>
> . . . .
>
> The only thought I can really remember was live, that I have to live. I have a son that I love dearly, and I was scared. The only thing I could think of was do something first. He said he would kill me when he stopped the truck, don't let him stop the truck.

### 3. Jury Instructions

The circuit court instructed the jury on self-defense. The circuit court instructed the jury on the justified use of deadly force in self-defense as follows:

> The use of deadly force upon or toward another person is justified if the defendant reasonably believes that deadly force is immediately necessary to protect himself on the

18

present occasion against death or serious bodily injury. The reasonableness of the defendant's belief that the use of protective deadly force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be when the deadly force was used.

### 4. Verdict and Sentencing

The jury found Williams guilty as charged. The circuit court sentenced Williams to imprisonment for a term of life with the possibility of parole.

### C. Intermediate Court of Appeals

The Intermediate Court of Appeals ("ICA") affirmed Williams' conviction. The ICA held the limitations imposed on Williams' proffered statements by the circuit court "did not materially impair Williams' claim of self-defense." According to the ICA, the evidence permitted by the circuit court was equivalent to Williams' proffered statements. Because the ICA considered the evidence admitted by the circuit court to be equivalent to Williams' excluded proffered statements, the ICA determined that any error in the court's limitations "did not materially impair his claim of self-defense and was harmless beyond a reasonable doubt."

### D. Application for Writ of Certiorari

Williams raises the following issues on appeal:

Whether the ICA gravely erred in holding that the circuit court did not err in limiting and/or excluding the proffered evidence under (HRE) 404(a)(2) and 404(b) because under its rationale (1) the proffered HRE 404(a)(2) evidence was not probative because it constituted unsubstantiated hearsay; (2) and error in limiting and/or

19

excluding any of the proffered evidence constituted harmless error because substantively equivalent evidence was introduced that satisfied Williams's HRE 404(b) request; and (3) Williams waived the HRE 404(a)(2) issue.

### III. STANDARDS OF REVIEW

In State v. West, 95 Hawai'i 452, 456-57, 24 P.3d 648, 652-53 (2001), this court stated:

> [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

(Quoting Kealoha v. Cty. of Hawaii, 74 Haw. 308, 319-20, 844 P.2d 670, 676 (1993)). Rulings made pursuant to HRE Rule 404 require a "judgment call" and we therefore apply the abuse of discretion standard:

> Evidentiary decisions based on HRE Rule 403, which require a "judgment call" on the part of the trial court, are reviewed for an abuse of discretion. HRE 404 represents a particularized application of the principle of HRE 403, and we will employ the same abuse of discretion standard of review.

State v. Richie, 88 Hawai'i 19, 37, 960 P.2d 1227, 1245 (1998) (internal quotation marks, citations, and footnotes omitted). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." Samson v. Nahulu, 136 Hawai'i 415, 425, 363 P.3d 263, 273 (2015) (internal quotation marks and citations omitted).

## IV.   DISCUSSION

**A.   A defendant has a constitutional due process right to present a complete defense.**

A person charged with a crime has a fundamental right to present a defense; the right to defend oneself has been deemed fundamental to a fair trial under the Fourteenth Amendment to the United States Constitution and under article I, section 5 of the Hawai'i Constitution.  Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (holding that the exclusion of evidence critical to the defense and the denial of an opportunity to cross-examine a witness denied the defendant a trial "in accord with traditional and fundamental standards of due process" and stating that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense"); State v. Matafeo, 71 Haw. 183, 185, 787 P.2d 671, 672 (1990) ("The due process guarantee of the Federal and Hawaii constitutions serves to protect the right of an accused in a criminal case to a fundamentally fair trial").

Central to the protection afforded by due process "is the right to be accorded 'a meaningful opportunity to present a complete defense.'" (emphasis added, citation omitted) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)).  It is "a right to [a] day in court," and "include[s], as a minimum, a right . . . to offer testimony[.]"  Rock v. Arkansas, 483 U.S.

44, 51 (1987) (quoting In re Oliver, 333 U.S. 257, 273 (1948));
see State v. Santiago, 53 Haw. 254, 259, 492 P.2d 657, 660
(1971).  Logically, the accused's right to call witnesses
includes "a right to testify himself, should he decide it is in
his favor to do so.  In fact, the most important witness for the
defense in many criminal cases is the defendant himself."  Rock,
483 U.S. at 52.  The right to "call[ ] witnesses is incomplete
if [the defendant] may not present himself [or herself] as a
witness."  Id.; see State v. Loher, 140 Hawai'i 205, 216, 398
P.2d 794, 805 (2017) (holding that restricting a defendant's
decision whether to take the stand to assert a defense would
violate various state and federal constitutional guarantees).
Thus, a defendant's right to present his version of the events
in his own words is "basic in our system of jurisprudence[.]"
In re Oliver, 333 U.S. at 273.  A defendant who chooses to
testify gives the jury an opportunity to consider the
defendant's credibility based on the defendant's manner and
demeanor.[7]  See State v. Walsh, 125 Hawai'i 271, 302, 260 P.3d
350, 381 (2011) (Recktenwald, C.J., concurring).[8]

_____

[7]     With regard to the credibility of witness testimony, the jury in this case was instructed as follows:

> In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness or lack thereof; the witness's interest, if any, in the result of this case; the

(continued . . .)

22

**B.    The circuit court erroneously prohibited Williams from presenting evidence relevant to his state of mind and therefore violated his constitutional right to due process.**

The circuit court prevented Williams from offering his own version of facts relevant to his self-defense claim, which violated his constitutional right to present a complete defense. Williams was unable to testify that his fear for his life arose from Quindt's statements to him that: Quindt knows about gang-bangers and gang-members; he has experience with violence from spending time in jail; Quindt got away with murder by "beating the charge" because someone else took credit for it; and he did the crime but got off on a technicality. Williams was also

_____

(. . . continued)

> witness's relation, if any, to a party; the witness's temper, feeling, or bias, if any has been shown; the witness's means and opportunity of acquiring information; the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility.

[8]    If a court seeks to exclude relevant evidence it must find the probative nature of the evidence to be substantially outweighed by the danger of unfair prejudice or another listed factor:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

HRE Rule 403. The circuit court failed to apply HRE Rule 403 to its exclusion of Quindt's testimony. Thus, the probative value of the constitutionally significant testimony of Williams as to his state of mind was ruled inadmissible by the circuit court without weighing its probative value against any prejudice to the government arising from admission of Quindt's statements as they were made to Williams.

precluded from testifying to the jury that Quindt told him that Quindt did hard time in California and had to learn to fight to survive.

Williams sought to introduce Quindt's proffered statements as state-of-mind evidence evincing fear Quindt would take his life.  In so doing, Williams sought to justify his use of deadly force in his own defense.[9]  Williams' state of mind when he struck Quindt was an essential element of his defense.[10]

The circuit court's curtailment of the defendant's testimony as to his state of mind at the time he committed the offense bespeaks a misapprehension of the discretion available to the court.  It is for the jury to evaluate the strength of the defendant's claim of self-defense with full opportunity to observe a defendant's complete presentation of the evidence that allegedly caused the accused to act in self-defense.[11]

---

[9]     Williams sought to introduce evidence of Quindt's statements as evidence of "another fact that is of consequence[,]" HRE Rule 404(b), namely, as evidence that he reasonably feared for his life when he acted in self-defense.

[10]    The use of deadly force in self-defense "is justifiable . . . if the actor believes that deadly force is necessary to protect himself against death [or] serious bodily injury . . . ."  HRS § 703-304.  "In evaluating the reasonableness of a defendant's belief that deadly force was necessary for self-protection, the evidence must be assessed from the standpoint of a reasonable person in the defendant's position under the circumstances as the defendant subjectively believed them to be at the time he or she tried to defend himself or herself."  State v. Lubong, 77 Hawai'i 429, 433, 886 P.2d 766, 770 (App. 1994).

[11]    The Dissent usurps the role of the jury by evaluating how the jury would weigh and reject Williams' testimony.  The Dissent concludes that the jury would not have found Williams credible even if he were permitted to

(continued . . .)

To that end, the details of the proffered statements of Quindt to Williams excluded by the circuit court convey additional support for Williams' self-defense that is absent in the altered version devised by the court. Learning to fight "to survive" has a different implication from simply learning to fight in jail. By removing the phrase "to survive" from Williams' proffered statement, the circuit court filtered out a key characterization of Quindt's statement to Williams that supported Williams' apprehension that Quindt would willingly engage in a brutal fight.[12]

---

(. . . continued)

pursue his strategic choice as to how to testify. Under this view, the jury would not have believed his claim to have been frightened when Quindt told him he learned to "fight to survive"; instead, the jury would have found beyond a reasonable doubt that Williams believed Quindt was less likely to use force because Quindt would only attack if he were attacked first:

> Put differently, the testimony that Quindt told Williams he had to learn to fight to survive implies that Williams knew Quindt would fight back to protect himself if attacked by another, not that Williams should fear Quindt would attack him first. The circuit court therefore ruled within its discretion when it excluded this language based on its conclusion that the language would confuse the jury.

Dissent at 13-14.

[12]     The Dissent concludes that a statement made by defense counsel during opening statement was an adequate substitute for Williams offering such testimony at trial. Id. at 13. In her opening statement, Williams' counsel told the jury that Quindt told Williams he had to learn to fight to survive. Respectfully, the Dissent's proposition connotes that evidence can be introduced during an opening statement . . . and condones reference to evidence during closing argument that is excluded from introduction during the evidentiary phase of the trial. The straightforward impropriety of a court requiring, encouraging, or causing the defendant to rely upon the opening statement to introduce evidence to the jury is settled. Cf. State v. Nofoa, 135 Hawai'i 220, 227-30, 349 P.3d 327, 334-37 (2015) (holding that it

(continued . . .)

25

In addition, the single statement selected by the circuit court that "[Quindt] knew how to fight and learned how to fight in jail" conveys a different, truncated message than the multiple excluded statements constituting Williams' proffered testimony:  Quindt learned how to fight to survive "in jail"; Quindt did "time for the crime of murder in California"; Quindt "did hard time in California"; and Quindt "has experience with violence from spending time in jail."  The multiple statements of Quindt to Williams excluded by the circuit court are relevant to Williams' apparent belief regarding Quindt's fixation on intimidating Williams with his alarming past; the exclusion of the statements also deprived Williams of the opportunity to have the jury judge his credibility to expound on the multiple conversations he contended caused him to fear for his life at the time he used force against Quindt.

In addition to curtailing Williams' testimony, the circuit court wholly excluded the statement made by Quindt to Williams that he knew about gang-bangers and gang-members.

---

(. . . continued)

was error for the court to instruct the prosecutor that evidence could be offered to the jury during the state's rebuttal argument).  Here, the trial court not only relegated the defense to a strategy legally impossible to achieve—namely, the admission of evidence during opening statement—the court thereafter instructed the jury to disregard the evidence.  The jury was instructed that "[s]tatements or arguments made by lawyers are not evidence. You should consider their arguments to you, but you are not bound by their memory or interpretation of the evidence."

According to the circuit court, it would be unclear to a factfinder what Williams meant by the term "gangbangers" because, for example, a gang member is not necessarily a violent person. Again, the purpose of the evidence was misperceived by the circuit court. Williams did not seek to communicate to the jury the meaning of "gangbangers." He sought to explain to the jury what gangbangers meant to him when the term was used by Quindt. As defense counsel explained in response to the court's characterization of the term gangbanger, "when [Williams] hears that term, he thinks it's something beyond just, you know minor gang activity, and it involves something a little bit more serious and involves more violence." The evidence describing Quindt's bragging about knowing "gangbangers" could have provided a specific, probative example of Quindt's alleged proclivity towards violence.[13]

The circuit court also reached the conclusion that Williams' testimony that Quindt bragged about killing with impunity and escaping accountability due to a "technicality" was irrelevant. The circuit court appears to have concluded that

---

[13] Contrary to the circuit court's understanding of the term, "gangbanger" can connote a particularly violent subset of gang membership. The Oxford English Dictionary defines a gangbanger as: "A member of a criminal or street gang, *esp.* one who engages in gang violence; a gangster." Gangbanger, Oxford English Dictionary (Jan. 18, 2018), http://www.oed.com.proxy.seattleu.edu/view/Entry/370323?redirectedFrom=gangba nger#eid/ (emphasis added).

since Williams was able to testify that Quindt bragged about killing people and about committing an alleged attempted murder, it would not be reasonable to assume the jury's verdict might be affected by the excluded testimony. If so, the conclusion depreciated the probative value of the excluded facts to Williams' claim of life-threatening fear. As a defendant accused of attempted murder, claiming self-defense, Williams' defense was not complete without being able to inform the jury through his testimony that the complainant told him he murdered and got away with it due to a technicality.

Indeed, the State introduced evidence to the jury that Quindt did not commit murder, telling the jury that Quindt was exonerated of murder. In so doing, the probative value of Williams' testimony that Quindt bragged about getting away with murder based on a technicality was heightened.[14] The probative value of Williams' testimony significantly increased. Left with the knowledge that Quindt was exonerated of murder, the jury might reasonably have concluded that Williams falsely testified when he claimed that Quindt bragged about killing people.

---

[14] Quindt's statement, that he escaped accountability for a murder due to a technicality, is manifestly relevant pursuant to HRE 401 because it makes it "more probable" that Williams acted in self-defense. HRS § 626-1, Rule 401. Pursuant to HRE Rule 403, the probative value of Quindt's statement "substantially outweighed" the unlikely possibility that it would cause confusion of the issues or mislead the jury. HRS § 626-1, Rule 403.

However, with the additional evidence omitted by the circuit court that Quindt claimed to have killed people and escaped accountability based on a technicality, the jury might have reasonably believed that Williams thought Quindt believed he could kill Williams and escape accountability. Moreover, the testimony of Quindt was corroborative of evidence elicited from him through cross-examination that it was Quindt—not Williams—who had murderous intent. Quindt conceded he was in an angry mood, that he carried a knife that evening, that Williams jumped from the car and was ordered back in the car by Quindt,[15] that Williams called his mother immediately after Quindt was injured, and that Williams took him to the Waianae Coast Comprehensive Health Center to receive treatment for his injury.[16]

---

[15] The Dissent fails to acknowledge evidence supporting Williams' claim that he feared Quindt would drive him to an isolated location and kill him. Instead, having reviewed all the evidence Williams was permitted to present at trial, the Dissent finds beyond a reasonable doubt that the jury would conclude Williams' defense amounted to the incredible proposition he was afraid Quindt would try to kill him as Quindt was driving and Williams was seated in the back seat:

> Moreover, despite Williams's extensive self-defense testimony, certain undisputed facts call into question Williams's credibility and render harmless the exclusion of further testimony. First, Quindt was driving his vehicle in the driver's seat when Williams attacked him from the back seat. It is difficult to imagine a scenario where Quindt could have reached into the back seat, while driving, and killed Williams.

Dissent at 21.

[16] The Dissent concludes that the trial strategy of defense counsel and the defendant as to the content of defendant's state of mind testimony supporting his self-defense claim is subject to alteration by the court. Id. at 13-14. Respectfully, no precedent identifies a consideration sufficient

(continued . . .)

The significance of the defendant's right to speak directly to his peers about the exact allegedly life-threatening words spoken to him by the complaining witness is ignored by the Dissent in its conclusion—beyond a reasonable doubt—that police officer testimony is a constitutionally available substitute for the testimony of the defendant.[17]  The Dissent adopts the proposition that Detective Robello's rendition of what Williams told Quindt is a legitimate substitute for Williams' testimony; the testimony of a prosecution witness is deemed a substitute for Williams' right to offer the same testimony directly to the

_____

(. . . continued)

to outweigh the right of the defendant to testify as to what was said to him by the complaining witness that caused the defendant to act in self-defense. Indeed, the United States Supreme Court rejected the proposition that the court had discretion to edit a defendant's testimony in support of her self-defense claim notwithstanding that the testimony was hypnotically refreshed. Rock, 483 U.S. at 60.  Per a statute prohibiting the use of posthypnosis testimony, the Supreme Court of Arkansas crafted testimony for the defendant permitting only her recollection of the events prior to her hypnosis.  The Arkansas court excluded the defendant's testimony remembered through hypnosis because the court deemed unreliable any memory allegedly restored by hypnosis.  Id. at 47-48.  The United States Supreme Court rejected the Arkansas Supreme Court's proposition that "any testimony that cannot be proved to be the product of prehypnosis memory is unreliable[.]"  Id. at 58. It held that the unreliability of memory allegedly restored through hypnosis did not render it "so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial."  Id. at 61.

Unlike the hypnotically induced testimony in Rock, the testimony of Williams bore no sign of mistruth—no indication of untrustworthiness other than the opposing testimony of Quindt.  Williams' testimony was directly relevant to the critical issue as to his state of mind when he allegedly acted in self-defense.  There was no need so overarching to his right to present his defense in his own words to empower the judge to decide the words he should use to defend himself before the triers of fact, nor to completely exclude statements made to him that bore on his self-defense claim.

[17]    The Dissent finds beyond a reasonable doubt that any error arising from the circuit court's exclusion of Williams' testimony was harmless.  Dissent at 22.

jury.  Respectfully, substituting prosecution witness testimony for the testimony of the accused, as to what was said to the accused by the complaining witness that engendered the accused to act in self-defense, renders the right to present evidence a mere pretense.

> **C.    The circuit court's errors in altering and excluding Williams' state of mind evidence were not harmless beyond a reasonable doubt.**

The violation of Williams' constitutional due process right to present a complete defense was not harmless beyond a reasonable doubt because there is "a reasonable possibility that the error complained of might have contributed to the conviction."  State v. Kassebeer, 118 Hawai'i 493, 505, 193 P.3d 409, 421 (2008) (quoting State v. Peseti, 101 Hawai'i 172, 178, 65 P.3d 119, 125 (2003)).

The improper exclusion and alteration of Williams' testimony as to his state of mind at the time he stabbed Quindt deprived Williams of evidence that he acted in self-defense as a result of his life-threatening fear of Quindt.  Faced with a credibility contest with Quindt, the most important witness in Williams' defense was Williams.  See DePetris v. Kuykendall, 239 F.3d 1057, 1062-63 (9th Cir. 2001) ("There is simply no denying that the most important witness in the defense of [the defendant] was [the defendant] herself.  The trial court not only excluded [essential evidence], but worse still, it

prevented [the defendant] from testifying fully in her own behalf about why she did what she did—this in a case where proof of the defendant's state of mind was an essential element of the defense.").

The circuit court prevented Williams from presenting his fully contextualized testimony as to his state of mind when he struck Quindt—in a case in which Williams' defense was based entirely on whether the jury believed that he feared that his life was in peril. The exclusion of such essential testimony is not harmless beyond a reasonable doubt. See State v. Calbero, 71 Haw. 115, 124-25, 785 P.2d 157, 161 (1989) (quoting State v. Williams, 21 Ohio St.3d 33, 36, 487 N.E.2d 560, 562-63 (1986))(holding that the defendant's testimony reciting statements of the rape complainant about prior sexual experiences were proffered for an "important purpose, which is to negate the implied establishment of an element of the crime charged. For this reason, the probative value of the testimony outweighs any interest the state has in its exclusion"); Fowler v. Sacramento Cty. Sheriff's Dep't, 421 F.3d 1027, 1042 (9th Cir. 2005) (holding that the erroneous preclusion of cross-examination of the victim "alone strongly supports a finding that the error was not harmless" because the case came down to a "credibility contest" between the victim and the defendant).

## V.    CONCLUSION

Williams' fundamental due process right to present a complete defense was violated.  The circuit court excluded evidence relevant to Williams' fear of Quindt, putting Williams at a significant disadvantage in proving his use of violence was a justified act committed in self-defense.  Accordingly, the ICA's judgment on appeal and the circuit court's judgment of conviction and sentence are vacated.  The case is remanded to the circuit court for a new trial.

Taryn R. Tomasa                    /s/ Sabrina S. McKenna
for Petitioner
                                   /s/ Richard W. Pollack
James M. Anderson
for Respondent                     /s/ Michael D. Wilson