LYONS FARMS TAVERN, INC., PLAINTIFF-RESPONDENT, v. MUNICIPAL BOARD OF ALCOHOLIC BEVERAGE CONTROL OF THE CITY OF NEWARK, DEFENDANT-APPELLANT, AND DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF ALCOHOLIC BEVERAGE CONTROL, DEFENDANT-RESPONDENT, AND NEWARK BETH ISRAEL HOSPITAL, OBJECTOR-APPELLANT.

Argued November 3, 1969—Decided February 2, 1970.

294

*Mr. Clive S. Cummis* argued the cause for objector-appellant Newark Beth Israel Hospital (*Mr. Alan J. Gutterman,* on the brief; *Messrs. Cummis, Kent & Radin,* attorneys).

*Mr. Sam Weiss,* Assistant Corporation Counsel of the City of Newark argued the cause for defendant-appellant (*Mr. Philip E. Gordon,* Corporation Counsel of the City of Newark, attorney).

*Mr. Rocco F. Senna* argued the cause for plaintiff-respondent Lyons Farms Tavern, Inc.

*Mr. Arthur J. Sills,* Attorney General of New Jersey, filed a Statement in Lieu of Brief on behalf of Division of Alcoholic Beverage Control (*Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by

FRANCIS, J.   Plaintiff Lyons Farms Tavern, Inc. operates a tavern at 368 Clinton Place, Newark, N. J. It is the holder of a plenary retail liquor license and, by virtue thereof, sells alcoholic beverages over the bar for on-premises consumption. Packaged goods for off-premises consumption are likewise sold over the bar; there is no separate room or department set aside for them. In early 1967 the volume of business having increased, and further increase being anticipated, plaintiff applied to the Municipal Board of Alcoholic Beverage Control for a place-to-place transfer of its license so as to include thereunder a 750-square foot addition to its building to be constructed in accordance with plans submitted with the application. After a full hearing the local board unanimously denied the request. Plaintiff appealed to the State Division of Alcoholic Beverage Control where the Director reversed and ordered transfer of the license so as to include as part of the licensed premises the enlargement described in the plans. Further review followed in the Appellate Division where in an unreported opinion the Director's order was affirmed. Thereafter we granted certification on the petitions of the City of Newark and Newark Beth Israel Hospital, one of the objectors in the proceedings below. *Lyons Farms Tavern, Inc. v. Municipal Board of Alcoholic Beverage Control of the City of Newark,* 54 *N. J.* 107 (1969).

At the local board hearing it appeared that plaintiff had conducted its business at this location since 1954. The tavern occupied the entire first floor and basement of the

building. The second floor contained living quarters which according to a neighbor witness had been rented to transient roomers. That practice seemed to have been discontinued. In describing the use of the second floor at the time of the hearing, one of plaintiff's officers simply said "[w]e have tenants there." The plaintiff's plan is to extend the length of the building from 60 feet to 90 feet and to lengthen the bar so that it would run almost the entire length of the old and the new building. Some stools would be placed at the bar and tables and chairs would be added to the new area for convenience of patrons. Outside the building off-street parking would be provided for from 20 to 24 cars. At least four sizeable signs presently bedeck the building to draw the public's attention. Plaintiff agreed to remove one of them, described as "garish," if its application for extension was granted.

Substantial opposition to the enlargement was voiced by neighbors, local residents, three neighborhood and civic associations with sizeable memberships, two Rabbis serving local and community interests, and by representatives of the nearby Beth Israel Hospital. These objectors spoke of Newark as being a tense, troubled city in which serious disturbances had occurred in the recent past. Crime in the streets, particularly muggings and other types of assaults, had been increasing not only at night but during the day as well. Although no witness could connect any specific criminal incident or neighborhood disturbance with plaintiff's tavern, it was suggested that consumption of alcohol frequently provides the stimulation for unlawful activity. In this connection, we take judicial notice of the fact that in recent times when riots have taken place in urban areas around the country, including Newark, one of the first acts of government to bring about peace was to order the closing of liquor-selling establishments. See, *Lieberman v. Saddle River Tp.*, 37 *N. J. Super.* 62, 64 (App. Div. 1955); *Reilly v. 180 Club, Inc.*, 14 *N. J. Super.* 420, 424 (App. Div. 1951); *State v. Chandler*, 98 *N. J. Super.* 241, 243–244

(Cty. Ct. 1967); *Von Eye v. Hammes,* 147 *F. Supp.* 174, 182 (D. Minn. 1956), aff'd *sub nom. Mounds Park Hospital v. Von Eye,* 245 *F.* 2d 756, 70 *A. L. R.* 2d 335 (8 Cir. 1957); *O'Connor v. Board of Zoning Appeals,* 140 *Conn.* 65, 98 *A.* 2d 515, 517 (1953); *State v. Boles,* 5 *Conn. Cir.* 22, 240 *A.* 2d 920 (Cir. Ct. 1967); *Smith v. Ballas,* 335 *Ill. App.* 418, 82 *N. E.* 2d 181, 183 (App. Div. 1948); *Klopp v. Benevolent Protective Order of Elks,* 309 *Ill. App.* 145, 33 *N. E.* 2d 161, 165 (App. Div. 1941); *Safee v. City of Buffalo,* 204 *App. Div.* 561, 198 *N. Y. S.* 646, 650 (App. Div. 1923); *Garcia v. Gusmack Restaurant Corporation,* 150 *N. Y. S.* 2d 232 (Cty. Ct. N. Y. 1954). In the briefs before us the objectors point out that the number of liquor licenses presently outstanding in Newark exceeds the statutory maximum. See, *N. J. S. A.* 33:1–12.14. They suggest also that this condition will not be alleviated simply by denying new licenses, if enlargments of licensed premises are authorized for the purpose of accommodating and encouraging increased business thereby attracting additional customers to the neighborhood. In this connection they note that there is another tavern a block from plaintiff's place and a second one two blocks away.

At the hearing attention was called to the fact that for residential purposes there has been a movement away from the core of the city and toward its perimeters. This has brought new residents to the plaintiff's largely middle-income-housing neighborhood. Although some commercial activities are present, much of the locality is devoted to residences. The organizations whose representatives testified were composed of hundreds of old and new residents of the locality. These groups were formed among other reasons to preserve the character of the neighborhood against the erosion and deterioration that are attacking urban areas. One of their objectives was to oppose any increase in liquor licenses or facilities for sale of liquor. It was their view that such increases are associated inevitably with physical and moral decay of the section of the community involved,

as well as with an upsurge in the rate of crime. One association presented petitions of 700 or more persons who opposed plaintiff's application; the representative of the second testified that he expressed the opposition of 400 to 500 other persons who lived in the immediate area; the third spoke on behalf of the Weequahic Community Council which consisted of approximately 50 block organizations representing "thousands of people." He expressed its sentiments in part in this fashion:

> "We are not overly impressed that the tavern has a good record. We only know one thing: Whiskey is the root of much evil. In a changing community it brings all kinds of problems: slums, crime, lawlessness and degradation. It is as simple as that."

One Rabbi, Chaplain of the City of Newark, testified as co-chairman of an organization composed of the clergy of all faiths in the Weequahic community (the section of the City in which plaintiff's tavern is located). His group was concerned with improving the area and preventing any further deterioration of its residential character. He expressed the belief of the clergy that expansion of plaintiff's liquor facilities undoubtedly would lead to further tensions and increased hazards for the citizens of the general area. In this connection he said that in his nearby synagogue he has four services every day. Many of his people refuse to attend the evening services because they are afraid to leave their homes and walk on the public streets.

A second Rabbi, pastor of the Torah Chaim Jewish Center located five blocks away from plaintiff's tavern, restated the opposition sentiments of his colleague. He spoke for the Center, its affiliated organizations, the Hebrew School (whose children come "from all directions" and attend the school in the late afternoon and early evening hours), its youth group and for King David Towers, Inc. The last named corporation was about to build, only four blocks from the tavern, a high-rise apartment for elderly people. It will involve an expenditure of about one and a half to two

million dollars and was expected to house at least 200 elderly persons. These people and other members of the Rabbi's faith are expected to attend evening services, some of which do not end until 9:30 P.M. It was the Rabbi's opinion that expansion of the tavern would attract more people to the area and create additional hazards for the locality. He pointed out that the tavern premises and parking area are on the corner of Clinton Place and Lyons Avenue. Lyons Avenue is a county road and the estimate was that 5000 motor vehicles using it daily would pass the tavern. He said also that about five weeks before the hearing his own secretary was the victim of a holdup in a nearby bank and that about two weeks later she was mugged, knocked down and her purse stolen. Although he could not say that these offenses were committed by a tavern patron, he was "trying to build a fence" against an increase in such hazards and thus protect against further deterioration of the neighborhood. The testimony of the owner of a one-family house located at 225 Lyons Avenue, 50 feet away from the tavern, might be noted here. He said among other things that patrons park in the area, buy package liquor in the tavern, consume it in their cars and then throw the empty bottles on his lawn or leave them near a tree in front of his home. The next day he has the burden of removing them. He feared that this condition would get worse if the tavern premises were expanded and made more attractive to customers.

The Beth Israel Hospital was a strenuous objector to the proposed expansion. The hospital is a complex of 15 buildings representing an investment of $9,000,000. Plans in existence contemplate a further expenditure of $15,000,000 within the next five years, for a total of $24,000,000. There is presently an employee force of 1100 persons, with more expected when the additional plant is constructed. The hospital and its employees are busy around the clock. The emergency entrance to the hospital is about a block away from plaintiff's tavern. During the last six years the

annual emergency room load has increased from 6500 to 24,000 patients.

At the time of the hearing and prior thereto the hospital maintained a school of nursing on its premises. A decision had been reached effective the following September to have the nearby Essex Community College take over the school and it was expected that there would be a substantial increase in the number of student nurses, many of whom would work at the hospital, arriving there both during the day and the evening.

The Director of Public Relations of the hospital said a security problem existed in the immediate area. He mentioned a number of criminal incidents, *e. g.,* the mugging of resident physician as he was leaving the hospital in the early morning hours. This assault was committed by four young men who were apparently intoxicated. On several occasions student nurses and other female employees were molested in the immediate hospital vicinity. According to a hospital supervisor the institution then had about 250 nurses who lived on Lyons Avenue and also 130 exchange nurses and other female personnel who lived on Lehigh Avenue, a nearby street. The female personnel work around the clock in three shifts. The supervisor testified that their attitude is changing. They are afraid to work at night or even to put in overtime. Many of them are afraid to walk to the theater at night because of the increased muggings and harrassment. Student nurses are not allowed to go out alone, and are forbidden to go into plaintiff's tavern. This witness said also that "everyone is afraid of Lyons Farms expanding" because it will bring more young men to the area. The record shows that because of the security situation, the hospital had been hiring off-duty city policemen to guard the area.

After hearing all of the evidence offered by interested parties, the local board "in consideration of the general welfare of the neighborhood" unanimously denied plaintiff's application. On appeal the Director observed that the li-

censee's request was simply to enlarge its existing establishment. He said the fact that enlargement would attract more business to the place was not sufficient reason for rejecting the request. In his view the significant fact was that a favorable decision for plaintiff would not increase the number of licenses presently existing in the area. Reference was made to the absence of any complaint of violation of any of the Division's rules or regulations over the years of plaintiff's operation.

The Director regarded the apprehension of the objectors as mere conjecture.[1] He said, on rehearing, that it was "understandable that apprehension may exist for the welfare of hospital personnel. However if the premises are conducted in a law-abiding manner (and it must be assumed that such will be the case) neither children nor persons employed or residing in the area have anything to fear." Consequently he held that the action of the local board in denying plaintiff's application was unreasonable and arbitrary. Our study of the record has led us to the opposite conclusion.

■ ■ Responsibility for the administration and enforcement of the alcoholic beverage laws relating to the transfer of a liquor license from place-to-place or so as to cover enlarged premises is primarily committed to municipal authorities. *N. J. S. A.* 33:1–19, 24; *Laurino v. State of New Jersey, Div. of Alcoh. Bev. Contr.*, 81 *N. J. Super.* 220, 227 (App. Div. 1963). In allocating spheres of operation between the State Division and municipal authorities the Legislature wisely recognized that ordinarily local officials are thoroughly familiar with their community's characteristics, the nature of a particular area and the dangers associated with the sale of alcoholic beverages. Consequently it provided for acceptance of local sentiments

[1] Two Directors were involved in the appeal. The Director who rendered the original decision accepted a public appointment elsewhere. A supplemental hearing followed before the new Director who concurred in the original decision.

in a number of fields of liquor control. *Borough of Fan-wood v. Rocco,* 33 *N. J.* 404, 412 (1960). Obviously when the lawmakers delegated to local boards the duty "to enforce primarily" the provisions of the act it invested them with a high responsibility, a wide discretion, and intended their principal guide to be the public interest. *Lubliner v. Bd. of Alcoholic Bev. Con. for City of Paterson,* 33 *N. J.* 428, 446 (1960).

The conclusion is inescapable that if the legislative purpose is to be effectuated the Director and the courts must place much reliance upon local action. Once the municipal board has decided to grant or withhold approval of a premises-enlargement application of the type involved here, its exercise of discretion ought to be accepted on review in the absence of a clear abuse or unreasonable or arbitrary exercise of its discretion. Although the Director conducts a *de novo* hearing in the event of an appeal, the rule has long been established that he will not and should not substitute his judgment for that of the local board or reverse the ruling if reasonable support for it can be found in the record. On judicial review the Director's factual findings as well as his ultimate determination ordinarily are accepted unless unreasonable or illegally grounded. *Fanwood v. Rocco, supra,* 33 *N. J.* at 414.

In the present case in reversing the action of the local board the Director emphasized that grant of plaintiff's application would not increase the number of licenses now in existence. That observation was true and concededly it is a factor for consideration. But its significance is not great in a community already burdened with outstanding licenses beyond the statutory saturation point. Moreover, as a further counterbalancing factor, the persuasive statement of one of the objectors should not be ignored. He said that from the affected neighborhood standpoint there is little difference between the grant of an additional license and the grant of permission for a substantial enlargement of an existing licensed premises to accommodate increased

business and to encourage further increase. Additionally the Director noted that over the years plaintiff had never been charged with violation of any of the rules and regulations of the Division pertaining to the operation of the tavern; and further, that none of the muggings or criminal assaults or acts of molestation had ever been traced to plaintiff's patrons. The good operating record, although commendable, cannot be deemed either a decisive or a major influence in this case. We are living in a parlous period and applications such as this must be reviewed in the ambience of the times. It would not do to apply the same test in populous Newark as would be utilized in a rural or suburban community. Time, place and circumstances make such an approach unrealistic.

Administrators and courts cannot close their eyes to what all others sense, see and understand. It is known generally that in the recent past Newark was a riot-torn city. The tensions responsible had varied origins and causes that are common to many urban communities and not to Newark alone. Crime and violence in the streets of cities, including Newark, have increased substantially in recent years making people reluctant to be abroad at night. Common knowledge tells us that peculiar evils are associated with the sale of alcoholic liquors in public taverns. The release of inhibitions because of consumption of alcohol is commonplace and is more apt to be associated with taverns than with other types of business. *Fanwood v. Rocco, supra,* 33 *N. J.* at 413. Drunken brawls are more likely to occur in taverns than elsewhere. It is common knowledge that the use of intoxicants frequently unduly excites the tempers, emotions and actions of those who indulge in them, and that a large percentage of serious crime stems from their excessive use. *Reilly v. 180 Club, Inc., supra,* 14 *N. J. Super.,* at 420–424; *O'Connor v. Board of Zoning Appeals, supra,* 140 *Conn.* 65, 98 A. 2d at 517; *Smith v. Ballas, supra,* 335 *Ill. App.* 418, 82 *N. E.* 2d at 183; *Klopp v. Benevolent Protective Order of Elks, supra,* 309 Ill. App.

145, 33 *N. E.* 2d at 165; *Fisher v. Robbins*, 78 *Wyo.* 50, 319 P. 2d 116, 126 (1957). Thus it is fair to say that the fears expressed by the objectors in this case about the likelihood of increased street hazards stemming from the additional patronage of plaintiff's enlarged tavern, are not mere gossamer threads; they are real and empirically sound. It is no answer to say that the tavern is and will continue to be well conducted or that patrons who show that they have had enough or too much to drink will be denied further service or be asked to leave the premises. It is what such persons do after they take to the public streets and byways that the neighbors fear.

We have no doubt that a municipal alcoholic beverage control board may reasonably honor local sentiment against the grant of a new liquor license or a place-to-place transfer of an existing one. *Fanwood v. Rocco, supra,* clearly expounded that view. In that case the holder of a package store license whose place of business was located on the outskirts of Fanwood, sought a transfer of the license to premises about a mile and a half away in the midst of the borough's only business center. The proposed new location was opposite the railroad station, two doors away from a confectionery store where local teenagers congregated, about a block away from a church and two and a half blocks from a public school. There was strong public sentiment against a package store in this section of the borough. Proximity of the church and school (although at least as far away as the Beth Israel Hospital in the present case) was the basis of much objection.

The governing body refused to grant the transfer on the ground that it would be contrary to the public interest, and contrary to the feeling of most of the people of Fanwood. On appeal the Director of the Division of Alcoholic Beverage Control reversed. He said that the general objections of the citizens in themselves did not justify the local body's denial of the transfer. In ordering approval of the transfer he said "the proposed location of the license is

in a business section and the operation of a package goods store under proper supervision would not, in any way, be detrimental to the community."

In declaring the Director's reversal to be erroneous mention was made of the "inherently far reaching dangers" of the liquor business and the need for strict regulation of it. The Court spoke of the wise stipulation of the Legislature for recognition of local sentiments in the administration of the alcoholic beverage law. It referred also to previous decisions holding that a local board may reasonably decline to issue a license because of proximity to the premises of a church or school, even though the church or school is beyond the restricted distance specified by *N. J. S. A.* 33:1–76. With particular reference to the considerations which are crucial to the present case, Justice Jacobs wrote for a unanimous Court:

"In the instant matter, the Director grounded his action on the view that the general objections advanced by the municipality were insufficient since the proposed new location was in a business section and the operation of a package store under proper supervision would not, in his opinion, be detrimental to the community. This view erroneously disregarded the municipal governing body's authority to decline to license the operation of any taverns or package stores in Fanwood's business center. The record leaves no room for doubt that widespread local sentiment favors keeping the area free of taverns and package stores and it matters little that this sentiment may have resulted in part from moral precepts and in part from the general objections voiced in the testimony of the councilmen. The fact is that the sentiment does exist and in honoring it the governing body did not act at all unreasonably. The interests of effective liquor control are best advanced where the municipal licensing program displays fair regard not only for the convenience of residents who purchase alcoholic beverages but also for the sentiments of residents who are unsympathetic or hostile to their sale." 33 *N. J.*, at 415.

We regard the rule of *Fanwood v. Rocco* as sound and we consider its basic thesis as providing the determinant for this case. Service of the public interest in licensing, in transferring of licenses and in controlling this exceptional business requires an attentive and sympathetic attitude toward the sentiments of substantial numbers of persons in

the locality, whether they be residents, commercial operators, or representatives of a nearby church, school or hospital. When their views are hostile to a licensee's request for enlargement of his existing business, and the views are reasonably associated with dangers to the public health, safety, morals and general welfare commonly recognized as incidents of the sale and consumption of alcohol, the local regulatory body does not act arbitrarily in honoring them. In fact, in our view, the local board would be remiss in its duty if it failed to give such views serious consideration. The Director regarded the fears and objections of the many protesters as more chimerical than real, and so felt that the equities favored the license holder. But the local board, which may be assumed to have a more intimate awareness of the needs and interests of the neighborhood in relation to a projected increase in liquor traffic felt otherwise, and acted accordingly. Our study of the record satisfies us that the board's finding that the paramount equities favored the objectors was reasonably grounded. There being no abuse of discretion present, it was improper for the Director to intervene and to substitute his judgment for that of the board.

The Appellate Division concluded from its examination of the record that the determination of the Director "was supported by substantial evidence presented in the whole of the record." Our penetrating review of all the evidence was engaged in by retreating to the fundamental issue in these cases: Did the decision of the local board represent a reasonable exercise of discretion on the basis of evidence presented? If it did that ends the matter of review both by the Director and by the courts. We agree with the local board that there was adequate and reasonable basis in the evidence considered in light of relevant time, place and circumstances to warrant its decision denying plaintiff's application.

Accordingly the judgment of the Appellate Division affirming the Director's action is reversed, and the matter

is remanded for reinstatement of the order of the Newark Municipal Board.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO, and HANEMAN—7.

*For affirmance* — NONE.