**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-19-0000319
09-SEP-2021
07:55 AM
Dkt. 5 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

PETER DAVID,
Petitioner/Defendant-Appellant.

SCWC-19-0000319

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000319; CASE NO. 1PC111000050)

SEPTEMBER 9, 2021

NAKAYAMA, McKENNA, WILSON, AND EDDINS, JJ.;
AND RECKTENWALD, C.J., DISSENTING

OPINION OF THE COURT BY EDDINS, J.

On the night of New Year's Day 2011, Peter David killed his cousin Santhony Albert. The two had been drinking at family gatherings. They fought outside a relative's apartment. David stabbed Albert. David said he acted in self-defense.

A jury convicted David of assault in the first degree. The Intermediate Court of Appeals affirmed.

David challenges the trial court's ruling preventing him from advancing evidence of Albert's .252 blood alcohol concentration (BAC) level unless he called an expert to explain its meaning.

We hold that the trial court erred in conditioning the BAC evidence on such expert testimony. Excluding the BAC evidence undercut David's constitutional right to present *any* and *all* competent evidence to support his defense. It violated David's due process right to a fair trial.

We vacate David's conviction for assault in the first degree and remand the case to the circuit court.[1]

---

[1] In this appeal, David also argues that several remarks made during trial by the deputy prosecuting attorney constituted prosecutorial misconduct. Because we do not find reversible error in the ICA's analysis of his prosecutorial misconduct claim, see State v. David, No. CAAP-19-0000319, 2020 WL 5821323 at *5-*9 (App. Sept. 30, 2020) (mem. op.), we decline to address this issue. Given that the trial court's error regarding the BAC evidence only affected David's conviction in Count 1, we affirm the ICA's Judgment on Appeal and the Circuit Court of the First Circuit's Judgment of Conviction and Sentence relating to Count 2. In Count 2, the jury convicted David of assault in the third degree relating to an incident after the stabbing. Because the jury could not unanimously answer a special interrogatory asking whether the assault was "committed in a fight or scuffle entered into by mutual consent," the court convicted David of assault in the third degree's petty misdemeanor variant (Hawai'i Revised Statutes (HRS) § 707-712(2)(1993)).

## I.    BACKGROUND

This was David's second jury trial.[2]  In his first trial, David faced a murder in the second degree charge.[3]  The jury convicted him of manslaughter.  Because the trial court had admitted improper rebuttal testimony, this court vacated David's conviction.  State v. David, 141 Hawai'i 315, 317, 409 P.3d 719, 721 (2017).

On retrial, the prosecution called several of David and Albert's relatives.  David also testified.[4]

David and Albert spent New Year's Day socializing with family members.  Like most of the men at the family gatherings, they drank alcohol.  Late in the evening, the cousins fought in a parking lot fronting a family member's apartment.  David stabbed Albert.  Albert died.

Before the fatal altercation, David and Albert were drinking in the apartment.  David testified he asked Albert for a beer.  Albert responded by punching him in the face.  He also struck David with a beer bottle and boasted, "you see, I can beat you up."  Albert's comment appeared connected to an earlier incident at a different family member's apartment.  There, David

---

[2]    The Honorable Paul B. K. Wong presided.

[3]    The Honorable Randal K. O. Lee presided.

[4]    A Chuukese interpreter interpreted David's testimony and interpreted for him during the trial.

explained, he went outside. Albert followed him and taunted: "[W]hat [are you] looking at[?] . . .[Y]ou want me to beat you up[?]" David said he ignored Albert. He knew Albert was "drunk."

David testified that not long after Albert punched him and hit him with a beer bottle, Albert went downstairs to the parking lot. He called David to meet him there. David did, but only to ask Albert to return to the apartment, not to fight. David said Albert kicked and punched him. David fell facedown; he was pinned between two cars. Albert stood above him. Albert continued to kick and punch him. David said he feared for his life. He felt "very scared" and thought he was "going to die from what [Albert was] doing."

David told the jury he acted in self-defense. He "grabbed something." He swung the object behind him toward Albert. When asked about his state of mind, David explained: "I was protecting myself, thought that something was going to happen to me. So that's –– that's why I did that, not knowing at what he was going to –– what the assault was going to be." David insisted he "was just trying to protect [him]self from injury, continuing threat . . . in a moment of rush."

David was unsure whether he contacted Albert with the object. But Albert stopped hitting him. Albert ran away. David followed. Soon, he saw Albert walking to the apartment

with help from another relative.  He saw Albert fall to the ground.  David left; he later learned that Albert had died.

The next day, a forensic pathologist performed an autopsy.  Albert's blood was drawn and tested.  The toxicology report showed that Albert's BAC was .252.

At David's first trial, the State presented BAC evidence testimony from the forensic pathologist.  She informed the jury: "[Albert] did have alcohol, and the level was .25 percent."

The second trial was different.  This time, the State moved in limine to preclude admission of the .252 BAC evidence.  The trial court ruled that the *presence* of alcohol in Albert's blood was admissible.  But the court prevented any references to the "actual number."  It reasoned:

> With respect to the toxicology result performed on Santhony Albert as part of the autopsy that was conducted by the Honolulu Medical Examiner's office, the Court denies State's motion in limine.  The presence of blood alcohol level in . . . Mr. Albert's body is relevant and corroborative of testimony that is going to be presented in this case.  So the fact that there is alcohol in the decedent's blood is admissible.
>
> The actual number, though, the .252, the Court is going to preclude, unless there's linkage, unless there is going to be some kind of testimony that will explain what the .252 means or does or how it affects the particular decedent in this case.  So that's a very high bar, I think, because alcohol has different effects on different people.
>
> And how drunk the decedent might have been is available to both parties by way of lay testimony and the percipient witnesses that observed the decedent on the date of the offense.

(Emphases added.)

Before the forensic pathologist testified, David moved the

5

court to reconsider its ruling.  The court denied the motion:

> The actual [BAC] number does provide the opportunity for the jury to speculate and perhaps even be confused because without any expert testimony to explain the meaning of the number, it is, in this Court's opinion, speculative.  As indicated by [the State], alcohol affects people differently.  In addition to tolerance of individuals, their weight and their metabolic makeup also affect the ability to process alcohol in a person's system and therefore minimize or enhance the effect of any particular blood alcohol on that person.  So <u>without any anchoring testimony to explain the number, it is in fact speculative</u>.
>
> And with respect to common understanding as to the legal limit for driving, while .08 is the legal limit established by the legislature to delineate the line in the sand as to whether or not a person is operating a vehicle under the influence of an intoxicant, it really doesn't point out to the amount of impairment that person is actually experiencing.  At one point in time, the legal limit not too long ago was .10, and for other states, it has been a different number, and again, that number, without some anchoring testimony, is speculative and does not add anything to the jury's consideration of the case.
>
> So based on [Hawaiʻi Rules of Evidence (HRE)] Rule 403, [David's] request is respectfully denied.

(Emphasis added.)  The court further ruled that defense counsel could not ask the forensic pathologist whether there was a "high level of alcohol" in Albert's blood.[5]

The expert then testified that Albert's blood contained alcohol; she did not reference his BAC or generally describe the level of alcohol in his blood.[6]

---

[5]    The court believed:

> The amount of intoxication that the decedent actually experienced is more accurately portrayed by the demeanor or the actions as seen by percipient witnesses and the amount of perhaps Budweiser or hard liquor drank by the decedent by percipient witnesses rather than the number or whether or not the blood level or blood alcohol level at the autopsy is high or low.

[6]    At trial, the forensic pathologist also testified that a stab-like wound penetrated Albert's lung and heart, "slightly at an upward angle,"

David's defense centered on his account of what happened. It also featured a Honolulu Police Department officer's testimony. Officer Violet Williams recounted an unconnected incident where an intoxicated Albert acted aggressively and irrationally toward her and other officers. Officer Williams testified that she responded to a "fight call" in November 2008. About twenty people were yelling at each other in a parking lot. As she was instructing everyone to leave, Albert approached her from behind. He pushed her left arm. He yelled, "fuck you, you bitch." He called her "pig" and other vulgarities. Officer Williams described Albert's demeanor as "extremely irate," "uncooperative," and "disrespectful." She smelled alcohol on his breath; he "appear[ed] to be intoxicated." When she tried to arrest Albert, he resisted. After he was placed in a police car, he kicked toward Officer Williams and other officers.

During closing argument, defense counsel spotlighted Albert's drunken, aggressive behavior to support David's defense:

> [W]e know how [Albert] is when he's drunk, intoxicated. This is circumstantial evidence as to who is first aggressor in this case.
>
> At another time how was [Albert] acting when he was intoxicated, even to a police officer? He's drunk, he's argumentative, he's belligerent, he's swearing. This is a

causing severe bleeding leading to his death. She opined that the "small irregular-shaped hole" in Albert's upper left chest was inconsistent with a knife wound; it was likely caused by "a narrow, pointed, elongated object . . . at least 4 inches or more in length."

> window, circumstantial evidence as to what Santhony Albert was on this particular January 2nd, 2011.  He was the first aggressor, ladies and gentlemen.[7]

The jury heard evidence about David and Albert's drinking. The witnesses generally discussed that "the men" at the family gatherings were drinking.  But no witness testified about the quantity and frequency of Albert's alcohol consumption.  And only one witness (aside from David) described Albert's condition as "drunk."[8]  Albert's BAC - the only evidence objectively quantifying the extent and degree of Albert's intoxication – was kept from the jury.

## II.  DISCUSSION

### A.  The probative value of the BAC evidence was not substantially outweighed by the danger of confusing or misleading the jury or unfairly prejudicing the State

Neither the trial court nor the ICA believed the BAC

---

[7]  The defense's opening statement also focused on Albert's intoxicated, violent behavior:

> A bruise to the forehead, a black eye to the right eye, a severe laceration to the bridge of his nose, a laceration to his neck, abrasions or lacerations to the right forearm, abrasions to his knee, some bruising to his back, some injuries to his heel and his feet.

> The evidence will show these are the visible injuries that [David] sustained from a drunken attack from his own cousin, Santhony Albert, on New Year's night, 2011.  What the evidence will show is that it came to a split-second decision, a choice between getting beaten up bad and potentially being killed or defending himself against his own cousin.

(Emphasis added.)

[8]  On cross-examination, this witness conceded that in an earlier proceeding (David's first trial), she had testified Albert appeared drunker than David.

evidence was irrelevant. Rather, its preclusion was based on the defense's failure to hire an expert to explain its meaning.

We conclude that defense expert testimony was not necessary to admit Albert's .252 BAC.[9] The typical adult citizen has the aptitude to understand, weigh, and value the reasonable inferences drawn from a decedent's .252 BAC in a self-defense case. This ability comes from jurors' common knowledge and life experience regarding BAC and alcohol's association with aggression. The trial court's concern about confusing or misleading the jury was misplaced. The court erred in requiring expert testimony about Albert's BAC and its behavioral impact.

### 1. Albert's .252 BAC was highly probative to David's defense

Protecting himself against his heavily intoxicated and violent cousin formed the nucleus of David's defense. David's self-defense claim pivoted on evidence that Albert became aggressive after drinking a lot of alcohol. The defense unveiled its theory during opening statement and bookended it in closing argument.

To support his defense, David testified that shortly before the fatal event, Albert was drinking alcohol and got violent with him. David asked Albert for a beer. Albert did not give

---

[9]     Proper foundation must be laid to admit BAC results. State v. Villena, 140 Hawai‘i 370, 376, 400 P.3d 571, 577 (2017).

him a beer.  Instead, Albert struck David with a beer bottle and punched him in the face.

David described the moments preceding Albert's death. David told the jury that Albert started the fight.  Albert punched and kicked him.  Albert continued to attack him after David fell to the ground.  David feared for his life.  So he stabbed Albert.

To further support his defense theory, David called Officer Williams.  Her testimony was relevant to Albert's history of exhibiting combative behavior when drunk.  She described responding to a "fight call" where an intoxicated, "extremely irate" Albert pushed her from behind, yelled vulgarities at her, and acted irrationally and aggressively toward police officers.

By showing Albert's violent, drunken behavior, David provided a sufficient basis to admit the BAC evidence.  See Swilley v. State, 295 So. 3d 362, 365-66 (Fla. Dist. Ct. App. 2020) (reasoning that the jury could hear BAC evidence where the defendant claiming self-defense testified that the complainant was aggressive when drinking and smelled like alcohol during the incident).

The BAC evidence provided an objective, scientific basis for the jury to evaluate the *extent* and *degree* of Albert's intoxication.  The evidence certified Albert's highly inebriated condition.  It had a tendency to prove consequential facts

central to David's defense: It would have (1) aided the jury's determination as to who was more likely the aggressor; (2) assisted the jury in understanding David's state of mind and his perception of imminent harm; and (3) helped corroborate David's view that Albert was acting violently and erratically while intoxicated, causing David to believe lethal force was necessary to protect himself. See Durrett v. Commonwealth, No. 2014-SC-000177-MR, 2015 WL 4979723 at *5 (Ky. Aug. 20, 2015) (mem. op.) ("Anytime someone is killed and the killer claims that he did so to protect himself, the behavior of the victim is obviously going to be of principal importance. And evidence that the deceased was intoxicated when he died can be relevant to assessing who was the aggressor by allowing for a fuller understanding of the victim's behavior and the killer's perception of imminent harm.")[10]; State v. Baker, 623 N.E.2d 672,

---

[10]    In Durrett, the Kentucky Supreme Court further opined that

> BAC evidence was relevant insofar as [the decedent's] inebriation might help explain the aggressive behavior alleged by Durrett and thereby corroborate Durrett's version of events. And it could also have been further relevant to explain why Durrett may have been acting under an erroneous belief of the need to act in self-defense or in the degree of force necessary as part of an imperfect self-defense, which Durrett was entitled to have the jury consider.

2015 WL 4979723 at *5. However, the Durrett court ultimately held that the trial court did not abuse its discretion by excluding the deceased's BAC because it was "not particularly corroborative" of the defendant's self-defense claim. Id. at *6. Unlike the present case where David and Albert drank together and had a physical altercation before the deadly incident, Durrett did not interact with the deceased "except, possibly, locking eyes" right before he shot him. Id. at *5. The alleged threat in Durrett occurred hours before the shooting. Id. The Durrett court held that "[d]ue to the

11

677 (Ohio Ct. App. 1993) (holding that the trial court erred in excluding evidence of the decedent's blood alcohol level because it was "important to the issue of self-defense, relevant specifically to the issue of who was more likely the aggressor in the incident").

Albert's .252 BAC had high probative value.  It far exceeded the evidentiary value attached to witness testimony recalling Albert's drinking or lay opinion testimony describing him as "drunk."

> **2.    HRE Rule 403 favors admission of the BAC evidence without "anchoring" expert testimony**
>
> > **a.    BAC levels and the association between excessive alcohol consumption and aggression are within the common knowledge and experience of ordinary jurors**

Blood alcohol concentration evidence requires little explanation.  The national standard for driving under the influence of alcohol is .08.  See Missouri v. McNeely, 569 U.S. 141, 169-70 (2013) (Roberts, C.J., concurring in part and dissenting in part) ("All 50 States and the District of Columbia have laws providing that it is *per se* illegal to drive with a BAC of 0.08 percent or higher."); see also HRS § 291E-61(a)(4) (2020) (prohibiting operation of a vehicle "[w]ith .08 or more

---

shooting's temporal remoteness to the only instance of alleged aggressive behavior by [the deceased], the probative value of the BAC evidence here was very low."  Id.  In contrast, the probative value of Albert's BAC was high given the testimony regarding Albert's drinking and his aggressive behavior toward David both shortly and immediately before the deadly fight.

grams of alcohol per one hundred milliliters or cubic centimeters of blood").[11]

BAC tests numerically quantify alcohol consumption. The decimal .08 is possibly the most recognizable number in criminal law. The mass media communications industry routinely publishes BAC numbers.[12] Public safety and health advisements also reference BAC levels.[13] The ordinary person may not understand

---

[11] Hawai'i adopted the .08 threshold in 1995. See 1995 Sess. Laws Act 226, § 9 at 587 (amending former HRS § 291-4 governing "[d]riving under the influence of intoxicating liquor" to set the BAC threshold at .08). Hawai'i law recognized the dangers associated with high BAC levels by providing for increased punishment for "highly intoxicated drivers" (defined as those with a BAC level exceeding .15). HRS §§ 291E-1 (2007), 291E-41(b) (2007 & Supp. 2008), 291E-61(b) (2007 & Supp. 2008). In 2009, the legislature removed these increased sanctions. 2009 Sess. Laws Act 88, §§ 5, 6 at 215, 217. And in 2010, it repealed the definition of "highly intoxicated driver." 2010 Sess. Laws Act 166, § 5 at 399. In July 2021, the legislature resurrected the definition of "highly intoxicated driver" and re-imposed increased sanctions on these drivers. Act 216 (July 6, 2021).

[12] See, e.g., Richard Winton, Judge expunges Mel Gibson's drunk-driving conviction, L.A. TIMES (Oct. 7, 2009, 12:00 AM PT), https://www.latimes.com/archives/la-xpm-2009-oct-07-me-gibson7-story.html [https://perma.cc/D65K-SFB2] (discussing actor Mel Gibson's 2006 drunk driving conviction based on his .12 BAC and his belligerent behavior at the time of the arrest, including "profane outbursts" and "repeated threats against the arresting deputy").

[13] See, e.g., Planning and Implementing Screening and Brief Intervention for Risky Alcohol Use: A Step-by-Step Guide for Primary Care Practices, CDC 4, 8, n.c. (2014) (emphasis added), https://www.cdc.gov/ncbddd/fasd/documents/alcoholsbiimplementationguide.pdf [https://perma.cc/73RJ-T733] (defining "binge drinking" as consuming more than the CDC's single day limit within a two-hour period because "drinking at this level typically brings the average adult's blood alcohol concentration (BAC) above 0.08 g/dL" and reporting that "[b]inge drinking is associated with a wide range of . . . health and social problems, including sexually transmitted diseases, unintended pregnancy, and violent crime"); Traffic Safety Facts: 2018 Data, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN. 1 (2019), https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812864 [https://perma.cc/Z42E-PCLK]("In 2018 there were 10,511 fatalities in motor vehicle traffic crashes in which at least one driver had a BAC of .08 g/dL or higher.").

how a BAC level is calculated or what it means chemically.  See State v. Werle, 121 Hawai'i 274, 282, 218 P.3d 762, 770 (2009) (stating "[b]lood alcohol tests are scientific in nature").  But adults in the United States generally share a basic understanding that .08 is a threshold quantification of alcohol consumption that impairs an individual's physical and mental faculties and ability to safely drive a car.  It is also common knowledge, and an unremarkable proposition, that the higher a person's BAC, the more impaired the person becomes by alcohol's effects.[14]

"Scientists and nonscientists alike have long recognized a[n] . . . association between alcohol consumption and violent or aggressive behavior."[15]  A strong association between alcohol

---

[14]     See The ABCs of BAC: A Guide to Understanding Blood Alcohol Concentration and Alcohol Impairment, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN. (2016) (emphasis removed), https://www.nhtsa.gov/staticfiles/nti/pdf/809844-TheABCsOfBAC.pdf [https://perma.cc/B6W2-A3PG] (explaining that "[t]he more you drink, the higher your BAC" and "the greater the effect [of alcohol]" and conveying that "[d]rivers with a BAC of .08 are approximately 4 times more likely to crash than drivers with a BAC of zero" while those with a BAC of .15 are "at least 12 times more likely to crash than drivers with a BAC of zero").  As the Dissent points out, see dissent at 2, n.1, various sources cited in this opinion's footnotes, including those published by reputable media and international organizations as well as U.S. government agencies, were not before the trial court.  This fact does not preclude us from relying on them to show that BAC and the association between alcohol and aggression are well-known.  See State v. Won, 137 Hawai'i 330, 366, 372 P.3d 1065, 1101 (2015) (Nakayama, J., dissenting) (citing various publications from the National Highway Traffic Safety Administration and California Department of Motor Vehicles to explain the link between "extreme OVUII," "recidivism," and "drunk-driving fatalities").

[15]     Alcohol Alert, NAT'L INST. ON ALCOHOL ABUSE AND ALCOHOLISM (updated Oct. 2000), https://pubs.niaaa.nih.gov/publications/aa38.htm [https://perma.cc/JE6B-NQ2B].

use and domestic violence and sexual violence is likewise well-known.[16]  Increased alcohol consumption may not *cause* violent or aggressive behavior, but ordinary adults understand the link between the two.[17]

Courts have long recognized that alcohol's effects such as violence are within jurors' common understanding.  See Byrd v. State, 123 So. 867, 869 (Miss. 1929) (acknowledging that "it is a matter of common observation that intoxication excites or emphasizes the ordinary characteristics of the person and makes a quarrelsome or dangerous man more so"); see also State v. Ferrer, 95 Hawai'i 409, 427, n.17, 23 P.3d 744, 762, n.17 (App. 2001) (citations omitted) (recognizing that "certain reactions to alcohol are so common that [courts] take judicial notice of

---

[16]    See Preventing violence by reducing the availability and harmful use of alcohol, WHO 3 (2009), https://www.who.int/violence_injury_prevention/violence/alcohol.pdf [https://perma.cc/RJ2H-PQ7L] ("Importantly, the role of alcohol in aggression extends across many different forms of violence, including youth violence, sexual violence, intimate partner violence, child maltreatment and elder abuse.").

[17]    See U.S. DEP'T. OF HEALTH AND HUMAN SERVS., Tenth Special Report to the U.S. Congress on Alcohol and Health: Highlights from Current Research 63 (2000) [hereinafter, Special Report to the U.S. Congress] ("Studies of violent incidents have continued to find that alcohol use often precedes violent events and that the amount of drinking is related to the severity of the subsequent violence."); see also Raul Caetano, et al., Alcohol-Related Intimate Partner Violence Among White, Black, and Hispanic Couples in the United States, NAT'L INST. ON ALCOHOL ABUSE AND ALCOHOLISM, https://pubs.niaaa.nih.gov/publications/arh25-1/58-65.htm [https://perma.cc/G9H4-WEUM] (citations omitted) ("A considerable proportion of the violence that occurs in the United States is associated with alcohol. A review of the literature on alcohol and violent crime concluded . . . homicide victims are more likely than their assailants to have been intoxicated if they provoked the fight.").

them" and these reactions include "[d]isorderly or unusual conduct"); State v. Randles, 334 P.3d 730, 734 (Ariz. Ct. App. 2014) (stating that it is "common knowledge that alcohol can cause belligerence and aggressiveness"); Lyons Farms Tavern, Inc. v. Mun. Bd. of Alcoholic Beverage Control, 261 A.2d 345, 351–52 (N.J. 1970) (noting that "[i]t is common knowledge that the use of intoxicants frequently unduly excites the tempers, emotions and actions of those who indulge").

The temporal and individual variations of alcohol's impact are similarly within jurors' common understanding. They understand that alcohol affects people in different ways. See Lynn v. Stinnette, 31 P.2d 764, 767 (Or. 1934) ("It is common knowledge that intoxicating liquor has varying effects on different individuals. Some it impels to boisterousness and loud talking; others, to quarrelsomeness and sullenness."); State v. Noble, 250 P. 833, 834 (Or. 1926) (declaring it was a "matter of common knowledge" that drinking alcohol "has some effect upon the person drinking it, and that this effect continues for a longer or shorter period, according to the amount drunk, and the individual drinking it").

Because BAC and the link between alcohol and aggression are within ordinary adults' common knowledge, David's jury was "fully capable of making the connections to the facts of [this] particular case before them and drawing inferences and

conclusions therefrom." State v. Salavea, 147 Hawai'i 564, 582, 465 P.3d 1011, 1029 (2020).

### b. Expert testimony about Albert's BAC and its effects was unnecessary

Under HRE Rule 702,[18] a person with "specialized knowledge" may testify if the knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." Specialized knowledge testimony imparts "knowledge not possessed by the average trier of fact who lacks the expert's skill, experience, training, or education." State v. McDonnell, 141 Hawai'i 280, 291, 409 P.3d 684, 695 (2017) (citation omitted).

When the issues in the case are within jurors' common knowledge, however, "expert testimony is unnecessary." Brown v. Clark Equip. Co., 62 Haw. 530, 537, 618 P.2d 267, 272 (1980). We conclude that alcohol and its association with violence fall into this category. Understanding the BAC evidence and alcohol's impact on Albert is not beyond the firsthand personal experiences and secondhand information accumulated by typical jurors. The jury knows an individual's .252 BAC means that the

---

[18] HRE Rule 702 (1992) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

individual is highly drunk; using the common knowledge about intoxication and its association with aggression, the jury can evaluate the BAC and its behavioral impact.  So it was improper for the circuit court to make the defense hire an "expert" to explain the BAC evidence before the jury could hear that evidence.

Courts in other jurisdictions have not required expert testimony in similar situations.  In State v. Randles, an Arizona self-defense case, the trial court admitted a defense expert's testimony regarding cocaine's effects.  334 P.3d at 733.  Expert testimony on alcohol's effects, however, was excluded.  Id.  Thus, without expert testimony, the jury considered evidence of the decedent's .13 BAC.  Id. at 734.  In upholding the ruling, the Randles court reasoned that the jury was able "to fully evaluate [the defendant's] self-defense claim" based on "the common knowledge that alcohol can cause belligerence and aggressiveness," in combination with other evidence presented to the jury.  Id.  See also Dixon v. Stewart, 658 P.2d 591, 597 (Utah 1982) (observing that "it is generally held that expert testimony is not required in the case of intoxication with alcohol").

Alcohol's behavioral effects are familiar to the average juror.  But the behavioral effects of drugs may not be. Reflecting this difference, some courts require expert testimony

on the effects of drugs, but not on the effects of alcohol.  See id. (observing that "some jurisdictions have specially held that a more trained or experienced observer is necessary to testify as to the intoxicating effects of drugs" while expert testimony on alcohol's impact is generally not required).

Even so, Hawai'i courts have allowed evidence about an eyewitness's drug use and addiction without expert testimony.  See State v. Sabog, 108 Hawai'i 102, 111, 117 P.3d 834, 843 (App. 2005) (holding that expert testimony was not a precondition to cross-examine a witness about drug use and addiction near the time of the incident); see also State v. Calara, 132 Hawai'i 391, 402, 322 P.3d 931, 942 (2014) (acknowledging that "a defendant is entitled to cross-examine a witness concerning the witness's drug use and addiction at or near the time of the incident to the extent that it affected the witness's perception or recollection of the alleged event" (cleaned up)).

On subjects that are unfamiliar to the jury, we have acknowledged the trial court's discretion to admit expert testimony.  See State v. Udo, 145 Hawai'i 519, 525-30, 454 P.3d 460, 466-71 (2019) (referencing expert testimony on cause of death in a homicide case); State v. Yamada, 99 Hawai'i 542, 546, 57 P.3d 467, 471 (2002) (referring to a defense expert's testimony that the defendant's mental disorder substantially impaired his "capacity to appreciate the wrongfulness of his

conduct and to conform his actions to the requirements of the law").

Although alcohol's general behavioral impact could be an appropriate subject for expert testimony,[19] we conclude that specialized knowledge testimony was not required to admit the BAC evidence.  The link between excessive alcohol intake and increased aggression is not a "widely held misconception[]" or "constrain[ed] [by] popular myths."  McDonnell, 141 Hawai'i at 291-92, 409 P.3d at 695-96 (citation omitted).

This court has shared misgivings about an expert-centric approach to fact-finding.  With experts' "aura of special reliability and trustworthiness," there is a danger that jurors will "abdicate their role of critical assessment" or "surrender their own common sense in weighing testimony."  State v. Batangan, 71 Haw. 552, 556, 799 P.2d 48, 51 (1990) (cleaned up); see also State v. Metcalfe, 129 Hawai'i 206, 225-26, 297 P.3d 1062, 1081-82 (2013) (mentioning that some judges prefer eliminating the term "expert" from jury proceedings to "ensure that juries are not overwhelmed by the so-called experts, so as to deprive them of their right to determine the facts of a case based upon all of the evidence and to ensure that trial courts

---

[19]     See, e.g., Rapoza v. Parnell, 83 Hawai'i 78, 86-87, 924 P.2d 572, 580-81 (App. 1996) (allowing a defense expert in a negligence case to testify about plaintiff's BAC and alcohol's impact to establish a possible causal relationship between plaintiff's intoxication and the accident).

do not inadvertently put their stamp of authority on expert testimony" (cleaned up)).  These concerns do not undermine the value of expert testimony in assisting the jury with understanding evidence.  But when the topic is familiar to the typical juror, conditioning admissibility on expert testimony devalues the collective wisdom of twelve citizens.

Jurors are expected to rely upon their general knowledge of how humans operate in the world.  See Hawai'i Pattern Jury Instructions – Criminal, Instr. 3.03 ("You must consider only the evidence that has been presented to you in this case and inferences drawn from the evidence which are justified by reason and common sense.").  Based on a case's evidence and their common knowledge, jurors can form their views about whether a person with a high BAC was, for instance, "boisterous[]," Lynn, 31 P.2d at 767, "amorous," Pezzo v. State, 903 So. 2d 960, 961 (Fla. Dist. Ct. App. 2005), "belligeren[t]," Randles, 334 P.3d at 734, "happy," State v. Griffin, 529 P.2d 399, 404 (Or. Ct. App. 1974), or "quarrelsome," Byrd, 123 So. at 869.

Hence, expert testimony on what Albert's .252 BAC meant was unnecessary.

> **c.** **The probative value of the BAC evidence was not substantially outweighed by the risks of confusing the jury or unfairly prejudicing the State**

We disagree with the trial court's conclusion that HRE Rule 403[20] prevented the BAC evidence's admission without expert testimony to explain its behavioral impact.

The BAC evidence was highly probative. See supra section II.A.1. One prosecution witness described Albert as drunk. This colloquial and subjective account of Albert's condition crudely measured his alcohol consumption. The chemical analysis of Albert's blood, in contrast, revealed a reasonably accurate measure of his intoxication.

It is difficult to see how jurors could be confused and misled by Albert's .252 BAC without testimony from a defense expert. The commonly understood .08 benchmark for impaired driving tethered the BAC evidence; it was a suitable anchor to evaluate the extent of Albert's intoxication. Cf. State v. Van Dyke, 101 Hawaiʻi 377, 381, n. 11, 69 P.3d 88, 92, n. 11 (2003) (pointing out in a homicide case involving self-defense that retrograde extrapolation evidence of the defendant's .198 BAC

---

[20] HRE Rule 403 (1980) provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"amount[ed] to two-and-one-half times the legal drinking limit"). As Van Dyke suggests, the .08 legal drinking limit is a useful, recognized benchmark for fact finders to gauge the degree and extent of intoxication.[21]

The trial court overstated the evidence's potential to confuse jurors. The court admitted Albert's .252 BAC in David's first trial. No expert testified about the BAC's meaning. It seems the jury ascribed weight and value to the evidence without confusion. Further, this court has decided homicide cases with self-defense claims where the jury heard BAC evidence without expert testimony about its behavioral effects. See, e.g., State v. Maluia, 107 Hawai'i 20, 23, 108 P.3d 974, 977 (2005) (describing evidence of the decedent's .195 BAC and the defendant's .131 BAC).

The BAC evidence would not, as the trial court believed, invite juror speculation. The jury heard about Albert's behavior on New Year's Day. It learned of his intoxicated, aggressive encounter with Officer Williams. All the case's evidence could and should be evaluated against the backdrop of the jurors' common knowledge about BAC and alcohol's effects.

---

[21] See also Special Report to the U.S. Congress at 56 (emphasis added) (reporting that, in one study involving drinking by criminal offenders, "the estimated average blood alcohol concentration (BAC) of offenders who had been drinking was in the range of double or triple the thresholds of impairment of most commonly used in State driving while intoxicated (DWI) laws," using the DWI laws as an anchor to compare the levels of intoxication).

The jurors' consideration of Albert's BAC in these circumstances can hardly be dismissed as "speculative." See Newell v. State, 49 So. 3d 66, 72-73 (Miss. 2010) (rejecting the trial court's ruling that toxicology results invited speculation by the jury because the decedent's aggressive and violent behavior had been presented before the toxicology-related testimony).

The trial court believed that an explanation about "how [BAC] affect[ed] the particular decedent in this case" was necessary "because alcohol has different effects on different people." We disagree.

First, whether expert testimony is admissible does not depend on its ability to provide case-specific, individualized opinions. See McDonnell, 141 Hawaiʻi at 293, 409 P.3d at 697 (concluding that the trial court properly admitted expert testimony when the expert "indicated that he was not familiar with any of the facts of the case" and did not even mention the child victim); see also State v. Plew, 745 P.2d 102, 107 (Ariz. 1987) (holding that "the expert may and often should properly refrain from specifically stating that *this* particular person *must* have acted in *this* precise manner at *this* exact point").

Second, the absence of expert testimony about alcohol's "particular" effects did not stop the trial court from allowing general evidence of Albert and David's drinking. If the ordinary juror lacked understanding about alcohol consumption

and its resulting behavioral effects, the court would presumably have foreclosed the testimony.  But it did not.  Further, under the court's rationale for excluding the BAC evidence, a routine feature of assault trials – testimony about how much, what, when, and where a person drank alcohol – would seemingly be inadmissible without expert testimony to explain the evidence.

Additionally, we are not persuaded by the trial court's reasoning that an individual's level of intoxication is more accurately portrayed by testimony regarding the individual's demeanor.  Although a witness may generally opine on another's sobriety, we have recognized flaws with opinion testimony based on observation.  See State v. Toyomura, 80 Hawai'i 8, 25, 904 P.2d 893, 910 (1995) (citation omitted)(observing that field sobriety tests "avoid the shortcomings of casual observations").[22]

We have not expressed the same concern with reliable BAC evidence.[23]  BAC levels are a useful gauge of alcohol consumption and its likely effects.  See supra section II.A.2.a.  If a lay witness can express an opinion regarding the sobriety of another, there is no logic to limiting the admissibility of

---

[22]   In State v. Jones, 148 Hawai'i 152, 176, 468 P.3d 166, 190 (2020), we held that police officers cannot give a lay or expert opinion that a driver appeared "intoxicated" in drunk driving prosecutions.

[23]   At trial and on appeal, the State did not challenge the reliability of the toxicology test performed on Albert.

reliable, objective evidence showing a person's intoxication level.

In rejecting David's evidence, the trial court and the ICA both concluded that it was cumulative. The trial court ruled: "how drunk the decedent might have been is available to both parties by way of lay testimony and the percipient witnesses that observed the decedent on the date of the offense." The ICA reasoned that there was "extensive evidence that Albert had been drinking" and mentioned that there was other testimony about his violent conduct while intoxicated.

Evidence is not cumulative unless it is "substantially the same as other evidence that has already been received." State v. Pulse, 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996). Unlike situations where witnesses testify to the same thing or images show the same thing, BAC evidence captures more than what general testimony about drinking conveys. Here, it proved that Albert was excessively intoxicated. No other evidence did.[24]

Additionally, David was entitled to present his own evidence about the extent and degree of Albert's intoxication. See State v. Lowther, 7 Haw. App. 20, 26, 740 P.2d 1017, 1021 (1987) (citation omitted) (acknowledging that criminal

---

[24] The dissent points to the "ample other evidence of Albert's intoxication." See dissent at 6. The evidence showed, as we acknowledge, that Albert drank or he was drunk; yet it did not reveal *how drunk* he was. One witness's testimony on cross-examination that Albert was drunker than David did not indicate the extent of his intoxication.

26

defendants have "the right to present their own evidence"). Much of the evidence relating to Albert's drinking came from the State's witnesses – family members who were unsympathetic to David's plight. Their general testimony did not fully frame the volatile situation David described finding himself in. David wanted to present a defense in which the jury could consider evidence that Albert's degree of intoxication exceeded three times the legal limit to drive – not merely that he had been drinking an unknown amount of alcohol.

Finally, even if there was some uncertainty about what a .252 BAC could prove, any doubt should have been resolved in David's favor. See State v. Kato, 147 Hawai'i 478, 494, 465 P.3d 925, 941 (2020) (advising that "a trial court should resolve a close question of admissibility in favor of the defendant").

We conclude that the trial court misapplied HRE Rule 403 when it excluded the BAC evidence unless the defense hired an expert. It did not confuse or mislead the jury; it wasn't prejudicial[25] or cumulative. The jury was fully capable of

---

[25] Other than holding that the BAC evidence introduced without expert testimony would be "speculative," neither the trial court nor the ICA identified any unfair prejudice to the State which would emerge from David's evidence. "Unfair prejudice means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." State v. St. Clair, 101 Hawai'i 280, 289, 67 P.3d 779, 788 (2003) (cleaned up). We do not believe the jury would decide the case emotionally or on any improper basis if it considered Albert's .252 BAC.

weighing and valuing the BAC evidence alongside all the case's evidence.[26]

**B.    Excluding Albert's BAC level violated David's constitutional right to present a complete defense**

David argues that excluding Albert's .252 BAC violated his due process right to present a complete defense.  The ICA held that the trial court's ruling was "not substantially detrimental" to David's defense.  We disagree.

A defendant's right to present a complete defense is vital to due process.  State v. Williams, 147 Hawai'i 606, 614, 465 P.3d 1053, 1061 (2020).  An accused has the "constitutional right to present any and all competent evidence" to support a defense.  State v. Abion, 148 Hawai'i 445, 448, 478 P.3d 270, 273 (2020) (emphases added) (citation omitted).  We have further explained:

> Where the accused asserts a defense sanctioned by law to justify or to excuse the criminal conduct charged, and there is some credible evidence to support it, the issue is one of fact that must be submitted to the jury, and it is reversible error for the court to reject evidence which, if admitted, would present an essential factual issue for the trier of fact.

Id. (emphases added) (cleaned up).

David said he acted in self-defense.  See HRS § 703-304(2) (1993 & Supp. 2001) ("The use of deadly force is

---

[26]    We hold that expert testimony is not a precondition to admit BAC evidence for the purposes underlying David's defense.  We do not foreclose expert testimony regarding BAC.

justifiable . . . if the actor believes that deadly force is necessary to protect [the person] against death, [or] serious bodily injury . . . ."). David's jury was instructed on his defense.

Presenting a rational explanation for his conduct underpinned David's defense. He boosted his theory of the case by calling Officer Williams and testifying himself about Albert's aggressive behavior while intoxicated. Evidence of Albert's .252 BAC could have affected the jury's understanding of Albert's motive or intention. It could have similarly influenced the jury's understanding of David's state of mind and his belief that danger was imminent. It also corroborated his testimony concerning Albert's aggressive behavior. The evidence would have helped explain David's perception that Albert was volatile due to being excessively intoxicated.

David's defense hinged on his credibility – the believability of his testimony about Albert's violent, irrational behavior and how it influenced David's conduct. See State v. Lealao, 126 Hawai'i 460, 470, 272 P.3d 1227, 1237 (2012) (recognizing that in a self-defense case, the defendant's credibility is "at the crux" of the case because the jury must decide "whether the defendant did in fact subjectively believe the use of force was necessary"). The BAC evidence was instrumental to bolstering David's credibility.

Because David's defense depended on his account of Albert's behavior before the fatal altercation and, by extension, on his credibility, we hold that there is a reasonable possibility that excluding the BAC evidence affected the trial's outcome. See State v. DeLeon, 131 Hawai'i 463, 486, 319 P.3d 382, 405 (2014) (holding that because the defendant's self-defense argument relied largely on the decedent's behavior immediately before the shooting, the exclusion of expert testimony that "the presence of cocaine could [have] render[ed] [the decedent's] level of intoxication perhaps a stage higher" presented a reasonable possibility that it could have affected the trial's outcome, and therefore it "compromised [the defendant's] ability to present a complete defense")[27]; see also Harris v. Cotton, 365 F.3d 552, 556-57 (7th Cir. 2004) (recognizing the state court's finding that "[h]ad the jurors known of [the decedent's] blood alcohol level and his use of cocaine, they [might] have credited [the defendant's] claim of [the decedent's] hostile and erratic behavior" and holding that there was "a reasonable probability that the outcome of the proceedings would have been different if the toxicology results were presented"); Cromartie v. State, 1

---

[27] Although the trial court allowed a defense expert to testify about the decedent's BAC and the effects of alcohol in DeLeon, 131 Hawai'i at 474, 319 P.3d at 393, the case addressed a different issue: the exclusion of expert opinion regarding cocaine use. Id. at 481-86, 319 P.3d at 400-05. The issue we resolve here - whether the defense must present expert testimony regarding BAC evidence - was not examined.

So. 3d 340, 341, n.2, 343 (Fla. Dist. Ct. App. 2009) (holding that exclusion of the decedent's .19 BAC violated the defendant's due process rights by preventing him from presenting evidence which "could have been critical in bolstering his theory of defense").[28]  Given Albert's erratic and belligerent conduct toward David before the fatal incident, the degree of his intoxication mattered.  Albert's BAC was the only evidence that provided a reliable measurement of his inebriation.  It was critical to bolstering David's credibility.

The circuit court's error in excluding the BAC evidence affected David's right to a fair trial.  See Pulse, 83 Hawai'i at 247-48, 925 P.2d at 815-16 (observing that excluding competent evidence that violated an accused's constitutional right was considered presumptively prejudicial and holding that the trial court's error in disallowing a defense witness's testimony at a suppression hearing was not harmless); Arias v. State, 20 So. 3d 980, 983-84 (Fla. Dist. Ct. App. 2009) (citation omitted) (holding that excluding the toxicology evidence showing the decedent's .21 BAC was reversible error because "a homicide

---

[28]    The ICA distinguished Cromartie from the present case on the basis that in Cromartie there was no other evidence regarding the decedent's drinking or any testimony concerning the decedent's violent behavior.  Although the underlying facts may differ, Cromartie supports the overarching principle that any evidence bolstering a defendant's self-defense theory should be admitted unless there are valid countervailing reasons.

defendant is afforded wide latitude in the introduction of evidence supporting his self-defense theory").

The right to due process entitled David to present any and all competent evidence tending to show that he acted in self-defense. Abion, 148 Hawai'i at 448, 478 P.3d at 273. Because the trial court rejected admissible evidence that was probative to consequential factual issues connected to David's defense, we hold that it violated David's right to present a complete defense.

### III. CONCLUSION

We vacate the ICA's Judgment on Appeal and the circuit court's Judgment of Conviction and Sentence regarding David's conviction for assault in the first degree. The case is remanded to the trial court for proceedings consistent with this opinion.

Taryn R. Tomasa,
for petitioner

Brian R. Vincent,
for respondent

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Todd W. Eddins

